HALL *v.* NESTER.

EQUITY   JURISDICTION — CONTINUING   TRESPASS — INJUNCTION — DAMAGES.

Where complainant was the owner of improvements along certain rivers, constructed for the purpose of driving logs down such rivers, and defendants, by force, seized such improvements, and retained them for several weeks, and proposed to retain them during an entire logging season, and were using them in such manner that lands belonging to complainant were damaged, and liable to suffer further damage, the trespass being a continuing one, complainant was entitled to equitable relief by injunction and assessment of damages.

| 122 | 141 |
| 124 | 411 |
| 122 | 141 |
| s80NW | 982 |
| 122 | 141 |
| 134 | 277 |
| 122 | 141 |
| 135 | 590 |
| 122 | 141 |
| 137 | 511 |
| 122 | 141 |
| 147 | 147 |
| 147 | 609 |
| 122 | 141 |
| f155 | 325 |

Appeal from Marquette; Stone, J.   Submitted October 27, 1899.   Decided December 2, 1899.

Bill by Lewis A. Hall against John F. Nester and others for an injunction.   From an order overruling a demurrer to the bill, defendants appeal.   Affirmed.

*Clark & Pearl*, for complainant.

*Chadbourne & Rees*, for defendants.

PER CURIAM.   The opinion of the learned circuit judge so clearly states the issue and the principles of law and equity involved that we adopt it:

"The bill of complaint in this cause states that in 1891 the complainant and Robert H. Munson and William C.

Busch organized a corporation known as the 'Yellow Dog River Improvement Company,' under the provisions of our statute, for the improvement of a small stream in said county, known as the 'Yellow Dog River,' a stream that flows through certain lands therein described; that said company also improved a stream known as 'Iron River,' which is the outlet into Lake Superior; that said improvement was for the purpose of assisting and facilitating the driving of logs down the said stream in the season of high water; that said company deepened the said streams, blasted out rock in their beds, and constructed a dam across the stream, and also constructed a dam, at the outlet of Lake Independence, across the said Iron river, for the purpose of raising the water in the said lake to furnish artificial floods with which to drive logs down the said Iron river into Lake Superior; that the said improvement company was the owner of all the lands surrounding said Lake Independence, except certain lots specified; and that said company improved said streams and erected dams at an expense of $18,000. The bill states that on the 11th day of March, 1897, the said corporation was duly dissolved, and a receiver appointed; that, upon a request of all the parties in interest, the said receiver deeded all of the property of said late corporation to the complainant on the 3d day of May, 1898; that by said conveyance complainant became vested with the title to all of said lands, as well as the said dams and other improvements on the banks of the said streams, out to the thread or channel of the stream, including the said dams specifically described in said bill; that complainant is the owner of the land upon which the dam on the said Yellow Dog river is situated.

"The bill states that the defendants have, during the past winter, lumbered and banked in the said stream about twelve million feet of pine sawlogs, and that said defendants have, without obtaining permission from complainant, or from said receiver, or from any other person having authority from complainant, taken possession of complainant's said property,—not only his structures for raising water, but have also put in slash-boards, so as to flood complainant's said land above the said dam, and have been flooding the same for about six weeks, and, without permission from complainant, defendants have been flooding the said land of complainant, which is covered largely with hard wood and mixed timber, which

is liable to be damaged and killed by such floods; that the defendants assert that it is their purpose to use the said property of complainant by force, and without consent of complainant, to aid in the driving of said twelve million feet of sawlogs down and through the said streams, without paying therefor, and to the detriment and damage of complainant; that said defendants entered upon the land of complainant near the said Lake Independence, and have taken possession of the logging-house belonging to complainant, and have occupied it as a logging-camp, without permission and as trespassers, and have also taken possession of the gates belonging to the said dam at the outlet of Lake Independence, on complainant's land, and have held the same by force, and that said defendants have threatened to throw the employé of complainant, in charge of the said property, into the stream, and drown him, if he interferes with their occupation and use of the said property in any way. The bill proceeds to state the value of the use of said property, and prays that the defendants be enjoined from using the structures of complainant upon his said land, and from taking complainant's gates and slash-boards, and from closing the natural flow of said stream for the purpose of creating said storage of water and floods as aforesaid, and from building, placing, constructing, repairing, and maintaining or operating the said dams upon the said streams so as to cause complainant's said lands to be used as storage ground for water and for reservoirs of water for producing floods as aforesaid, and from operating the dams on said streams in any place from which the waters in said streams would be backed up and flowed on complainant's said lands. The bill then prays for an accounting touching the amount due complainant by way of damages for flowage of said lands, and the destruction of timber, and for the use and occupation of said lands and water privileges, and also prays for general relief.

"The bill was filed on May 6, 1898. I ordered that an injunction issue, but provided that, if defendants would execute a bond to complainant, conditioned to pay him the damages that he had sustained from the injury of the property of complainant named in the bill, and for the use and occupation of the same by defendants, the said injunction should be dissolved. I made this order because I did not want to oppress the defendants, and because it seemed to me that to stop the logs where they were would cause

them great damage. The bond was given, and no injunction was ever served. This bill has been demurred to upon the grounds that the facts as stated in the bill do not entitle complainant to an injunction, for the reason that no irreparable damage was alleged, and no damage is shown which cannot be fully, completely, and adequately compensated in damages recoverable in a suit at law, and because complainant has an adequate remedy at law, and the damages, if any, should be assessed by a jury. In considering this demurrer we must take the statement of facts in the bill as true. If this bill is true, the trespass here complained of is not a casual trespass. It presents a case where the defendants propose to usurp and seize the lands and property of the complainant, and use them for an entire season,—for the court will take notice that to drive twelve million feet of logs down this stream would take an entire season; in fact, counsel for defendants, upon the argument, admitted that all of the logs had not yet been run down; and when the bill was filed defendants had been in possession of some of the property for six weeks. The bill prays for a perpetual injunction to restrain defendants from a similar trespass in the future. This fact alone might furnish a reason why the court should hold the case, and why damages alone might not furnish an adequate relief.

"The first question to be answered is, Does the bill state a case entitling complainant to an injunction? I think that the modern rule has enlarged the jurisdiction of equity in cases of trespass and other like cases. Mr. Pomeroy, in his Equity Jurisprudence, at section 1357, states the law to be this:

" 'If a trespass to property is a *single* act, and is *temporary* in its nature and effects, so that the legal remedy of an action at law for damages is adequate, equity will not interfere. The *principle* determining the jurisdiction embraces two classes of cases, and may be correctly formulated as follows: (1) If the trespass, although a single act, is or would be destructive, if the injury is or would be irreparable,—that is, if the injury done or threatened is of such a nature that, when accomplished, the property cannot be restored to its original condition, or cannot be replaced, by means of compensation in money,—then the wrong will be prevented or stopped by injunction. (2) If the trespass is *continuous* in its nature, if repeated acts of wrong are done or threatened, although each of these acts, taken by itself, may not be destructive, and the legal remedy may, therefore, be adequate for each single act *if it stood*

*alone,* then, also, the entire wrong will be prevented or stopped by injunction, on the ground of avoiding a repetition of similar actions. In both cases the ultimate criterion is the inadequacy of the legal remedy. All the cases, English and American, have professed to adopt the inadequacy of legal remedies as the test and limit of the injunctive jurisdiction; but in applying this criterion the modern decisions, with some exceptions among the American authorities, have certainly held the injury to be irreparable, and the legal remedy inadequate, in many instances and under many circumstances where Chancellor Kent would probably have refused to interfere. It is certain that many trespasses are now enjoined which, if committed, would fall short of *destroying* the property or of rendering its restoration to its original condition impossible. The injunction is granted not merely because the injury is *essentially* destructive, but because, being continuous or repeated, the full compensation for the entire wrong cannot be obtained in one action at law for damages. While the same formula is employed by the courts of equity in defining their jurisdiction, the jurisdiction *itself* has practically been enlarged. Judges have been brought to see and to acknowledge—contrary to the opinion held by Chancellor Kent— that the common-law theory of not *interfering* with persons until they shall have actually committed a wrong is fundamentally erroneous, and that a remedy which *prevents* a threatened wrong is in its essential nature better than a remedy which permits the wrong to be done, and then attempts to pay for it by the pecuniary damages which a jury may assess. The ideal remedy in any perfect system of administering justice would be that which absolutely precludes the commission of a wrong, not that which awards punishment or satisfaction for a wrong after it is committed.'

"See foot-note for particular instances in which injunction has been granted. See Id. §§ 138, 170, 220, 221, 1346; *Troe* v. *Larson,* 84 Iowa, 649 (35 Am. St. Rep. 336); *Shields* v. *Arndt,* 4 N. J. Eq. 234; *Holsman* v. *Bleaching Co.,* 14 N. J. Eq. 343.

"Concurrent jurisdiction should be exercised when the object sought is incapable of being accomplished by courts of law; as, for instance, a perpetual injunction, or a preventive process, to restrain trespass, nuisance, or waste. It may be said, therefore, that concurrent jurisdiction of equity extends to all cases of legal rights when, under the circumstances, there is not a plain, adequate, and complete remedy at law. Story, Eq. Jur. §§ 76, 926–929. If the trespass be fugitive and temporary, and adequate compensation can be obtained in an action of law, there is no ground to justify interference in equity. But if a party

threatens to or does take possession of a man's farm, or mill, or other real estate for a whole season, to the exclusion of the owner, must the owner stand by, and content himself with figuring out his damages? I think not. So I conclude that the bill entitled the complainant to an injunction: That he did not get one is not his fault. The court had jurisdiction. The principle that equity, having once acquired jurisdiction, will retain it, to give such full relief as will finally dispose of the controversy, is well settled. *Whipple* v. *Farrar*, 3 Mich. 436 (64 Am. Dec. 99); *Miller* v. *Stepper*, 32 Mich. 194; *Wallace* v. *Wallace*, 63 Mich. 326; *Drayton* v. *Chandler*, 93 Mich. 383, 388; *In re Axtell*, 95 Mich. 244; *Chase* v. *Boughton*, 93 Mich. 285; *George* v. *Light Co.*, 105 Mich. 5. The court sometimes sends the complainant to a court of law, as it did in *Brown* v. *Gardner*, Har. Ch. 299, cited by defendants' counsel; but one of the reasons there stated was that the court did not feel called upon to keep the parties in the Supreme Court, and send an issue down to the court to try the question of trespass, and then, if so found, to assess damages. The general rule is, as stated above, to hold the case for the purpose of giving damages. The parties have all appeared, and are before the court. A bond has been given to pay any damages that may be found due. This court has the power, if deemed wise, to call a jury, and take its advice as to the damages, and I see no reason why the bill should be dismissed. As it is, the court will have power to order a perpetual injunction as to the future, and thus save another suit. The demurrer will be overruled, and the defendants given 20 days in which to answer, on payment of the costs of the demurrer to be taxed."

Decree affirmed, with costs, and the case remanded for further proceedings.